**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **CHRISTIN ROYKO** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO.5:20-cv-647** |
| | § | |
| **NEWTON ASSOCIATES 1, LTD.** | § | |
| **D/B/A PIZZA HUT** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES **CHRISTIN ROYKO**, hereinafter referred to as "Plaintiff," or "Ms. Royko," and files this Plaintiff's Original Complaint, complaining **NEWTON ASSOCIATES 1, LTD. D/B/A PIZZA HUT,** hereinafter referred to as "Defendant," or "Pizza Hut." Ms. Royko alleges violations of Americans with Disabilities Act of 1990 (ADA) as Amended, the Family and Medical Leave Act (FMLA), and Title VII.  For causes of action, Ms. Royko would show this Court as follows:

**I.**
**PARTIES**

1. Plaintiff **CHRISTIN ROYKO** is a resident of Albuquerque, New Mexico.

2. Defendant **NEWTON ASSOCIATES, 1 LTD. D/B/A PIZZA HUT** is a Texas Limited Partnership doing business in San Antonio, Bexar County, Texas, which may be served with process by the clerk of the court by certified mail, return receipt requested by serving Defendant's registered agent: John M. Richmond 1009 Austin Hwy, San Antonio, TX 78209.  A waiver of service has been requested.

## II.
## JURISDICTION AND VENUE

3. The Court has jurisdiction to hear the merits of Royko's claims under 28 U.S.C. §1331 as they arise under federal statutes, specifically, Americans with Disabilities Act as amended, the Family and Medical Leave Act, and Title VII.

4. All the acts alleged herein occurred in Bexar County, Texas.

5. Venue in this district and division is proper under 28 U.S.C. § 1391(b)(2).

6. At the time of filing, damages are within the jurisdictional limits of the court.

## III.
## MISNOMER / MISIDENTIFICATION

7. In the event that any parties are misnamed or are not included herein, it is Plaintiff's contention that such was a misidentification, misnomer, and/or such parties are/were alter egos of parties named herein. Alternatively, Plaintiff contends that such corporate veils should be pierced to hold such parties properly included in the interest of justice.

## IV.
## FACTS

8. Christin Royko worked for Defendant for over 14 years. Prior to being constructively discharged in July of 2019, Royko was a manager for Defendant. She was a top performer for Defendant and received awards and commendations including having her store ranked 262 out of 6,100 U.S. stores in 2018.

9. Beginning in 2015/2016 Royko began to receive frequent text messages from a male employee, Ryan Fleming. These escalated from 2015-2019 beginning with work related messages but then escalating to Fleming repeatedly telling Royko that he loved her and culminating with threats against her after she told him to stop texting and harassing her.

2

10. In September of 2016, Fleming would send messages after working hours seeking more attention from Royko. He would send messages such as "I just want to see you smile sometimes," and "I didn't get a hug like Ally did this morning…nor do I deserve it, but I did notice your hair…" and "Why do I feel like, it's a gift just to be your fiend."

11. The messages also had comments of a sexual nature such as "Should I feel strange for smelling a little leather???? No! Tickel your ass with a feather, Yes!"

12. He would repeatedly message Fleming after working hours making comments including messages in October 2016 including "I can't help myself but to say good night," and "I don't blame you for not answering it's all good" when Royko would not respond.

13. Fleming also began telling Royko that he loved her. Saying "I'm taking my job there should I say I love you no."

14. Fleming continued to make comments in December 2016, including "Sometimes I think I'm on the edge of losing it but then I think of you and understand how just to hold on try 2 have a nice evening."

15. In January 2017, Royko told Fleming to stop sending her text messages but even though he stated he would stop, he persisted. Fleming reacted negatively to being told to stop, texting Royko in January 2017 that "Okay cut my balls off I don't give a shit about anything ever again what am I supposed to think or say." He continued sending messaged telling Royko that he loved her.

16. In January of 2017, Royko was diagnosed with breast cancer.

17. Royko went out on FMLA leave in March after making plans for how her store would be covered while she was gone.

18. On April 12, 2017, only 14 days after her surgery, Royko was contacted by Linda Snow who told her that a manager who was supposed to cover her shift had not shown up and that Royko needed to find a replacement. Royko told her that she was still bed ridden and had drains in her following the surgery and that she was unable to assist with the scheduling.

19. Following that conversation, Snow's attitude changed towards Royko and she became more irritated with Royko's absences. A week later Snow called her and asked her when she would be returning to work and told her that she would have to be replaced if she did not return to work soon.

20. Royko was upset by the conversation because she needed the income and health insurance provided by the job. As a result, she returned to work before the recommended time.

21. On July 18, 2017, Royko had a reconstructive surgery. She took less than the recommended time off after the surgery because of her concerns that she would lose her job.

22. Fleming continued to send messages such as "you mean the world to me please don't shut me out" in June of 2017 and "God I miss you" in July 2017.

23. In November 2017, Royko went to her Area Manager, Bahram Kaman to complain about Fleming's unwanted advances and frequent texts.

24. When Royko had addressed the issue with Snow, rather than being supported, Royko was told that she had to be very careful because the company did not want an employee to feel like he was being treated unfairly and that Snow thought Fleming was a good employee.

25. Fleming continued sending messages to Royko saying "I love you so much I love you and you know that" in December 2017 and continuing into 2018.

26. In April 2018 she blocked contact with Fleming unless she was at work.

27. Royko was wary of taking complaints to HR because her District Manager Snow, who had reacted negatively to her prior requests for help was responsible for HR.

28. On November 6, 2018, a company attorney came to speak to the office staff, General Managers, Area Managers, and District Manager to discuss what harassment in the workplace was and what they were supposed to do if they encountered harassment. Prior to the meeting Royko received her paycheck in an envelope. The word ""IDIOT" was written across the envelope. Royko understood this as blaming her for reporting harassment and leading to the attorney showing up to discuss harassment.

29. After the meeting Royko asked the attorney if the envelope was harassment and was told that it was. Royko also showed Jeff the Area Manager the envelope. He told her not to work about it and get a new envelope.

30. At this point Royko believed that she was on her own and that no one else would support her because nothing was being done when she brought issues to the attention of her superiors.

31. In December 2018, Royko returned to the doctor and was told that she would need to have a follow up surgery related to her breast cancer. She scheduled the surgery for April 2019. Royko told Snow about the surgery and that she would need to take 4 weeks off to fully heal. Following that, Snow stopped communicating with Royko verbally and started only sending her texts.

32. Royko had the surgery and returned to work on May 2, 2019.

33. Because she was going to be gone, she unblocked Fleming on her phone since he may need to contact her for work related issues. However, when she did so, Fleming began to

immediately resume the pattern of harassing texts and calls. She asked Bahram to assist her since she did not believe that Kim or Snow would help based on her past experiences.

34. On June 13, 2019, Kim was scheduled to come by the store but canceled at the last minute.

35. On or about June 21, 2019, Royko told Fleming that he was harassing her, he responded saying "You're taking it the wrong way I promise you that I know what harassment means and what I say to you is my true feelings it's nothing about harassment it's about you and me doing everything I can for you. Why can't you see that? Stick a pin in my eye, it's called communication wow where the f*** are you coming from Harassment? Oh no let's go let's go. A little shrimp cocktail and strawberries I guess that's harassment. If this is what it comes down to I'll see you Linda bare-ham and everyone else in cour." (sic)

36. Royko asked Bahram to come by so that she could have a witness when she wrote up Fleming.

37. After this, Royko became concerned for her safety and contacted Snow despite her misgivings. She told Snow that she had attempted to write Fleming up and that she had asked Bahram to come by to witness the write up but that he had not. She also told Snow that she had blocked Fleming's communications unless she was at work.

38. Royko was surprised that instead of supporting her, Snow told Royko that she could not block Fleming on her cell phone because it was "not fair."

39. The next day Fleming yelled at Royko that he "would not be going anywhere." Royko did not feel safe and contacted Snow to advise her of the situation and to let her know that she would be going to another location to work through lunch.

40. Royko was called in to a meeting with Snow, Kim, and Bahram. Royko explained what was going on and read them some of the text messages Fleming had sent her saying that he loved her.

41. Snow downplayed the messages saying that the comments about loving her were because Fleming thought of Royko as a sister. Snow also told Royko that the gifts Fleming had brought Royko were for the entire store. Snow blamed Royko for Fleming's harassment of her and said that Fleming was a good employee.

42. Royko was shocked that Snow was entirely focused on protecting Fleming rather than addressing her concerns about harassment and the escalation in Fleming's messages to her.

43. Snow told Royko that she would be moving her to another store. Royko told her that she did not want to be moved to another store because of the high speed and customer service rankings of the store. Royko was concerned about this because the individual store's performance influenced the bonus that Royko or any other manager would receive. Royko was aware that the location that Snow wanted to move her to,

44. Snow then asked Royko "So does that mean you quit?" Royko said that she was not quitting but Snow told her that she did not have a choice. Royko was shocked that Snow again blamed her for Flemings conduct towards her.

45. Royko was told not to return to the Stone Oak location and that she would be working at the Nacogdoches location. Royko was aware that the Nacogdoches location was in a dangerous area and did not feel safe working there. As a result, she felt compelled to resign and gave her two weeks' notice.

## V.
## VIOLATIONS OF THE FAMILY AND MEDICAL LEAVE ACT –RETALIATION FOR

7

### REQUESTING LEAVE

46. Plaintiff has satisfied all jurisdictional prerequisites in connection with his claim under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et. seq*.

47. Defendant is an "employer" as defined by the FMLA in 29 U.S.C. § 2611(4).

48. Defendant employed, and continues to employ, fifty or more persons at, or within a seventy-five (75) mile radius of, the location where Plaintiff worked. Thus, it is believed Defendant was covered by the FMLA.

49. During the time that Plaintiff was employed by Defendant, she was an "eligible employee" as defined by the FMLA in 29 U.S.C. § 2611(2).

50. While Plaintiff was employed by Defendant, Plaintiff had an illness or medical condition that can be defined as a "serious health condition" under the FMLA as outlined in 29 U.S.C. § 2611(11). Plaintiff was entitled to medical leave for her serious health condition as provided for in the FMLA (in 29 U.S.C. § 2612(a)(1)(D)).

51. Plaintiff had a serious health condition, informed Defendant that she would need leave to attend medical visits, and qualified for leave under the Act.

52. Following her return from FMLA leave Defendant took actions against Plaintiff and refused to support her creating an untenable situation and compelling Plaintiff to resign.

### VI.
### DISABILITY DISCRIMINATION AND RETALIATION UNDER THE AMERICANS WITH DISABILITIES ACT, AS AMENDED

53. The evidence will show that:

   (1) Plaintiff was disabled (actually disabled and/or "regarded as" or "perceived as" disabled due to his disabilities) specifically Plaintiff had breast cancer.

(2) Plaintiff was qualified for her position;

(3) Plaintiff suffered an adverse employment action in that she was constructively discharged following her return from breast cancer treatment; and,

(4) The circumstances arising raise an inference of disability discrimination.

## VII.
## SEX DISCRIMIANTION AND RETALIATION FOR REPORTING SEX DISCRIMINATION IN VIOLATION OF TITLE VII

54. The evidence will show that (1) Plaintiff belonged to a protected category (Plaintiff is a woman); (2) that Plaintiff was qualified for her position; (3) that Plaintiff suffered the adverse employment action of constructive discharge; and (4) the circumstances raise an inference of sex discrimination.

55. Additionally the evidence will show that (1) Plaintiff engaged in protected conduct (bringing complaints of sex discrimination); (2) that Plaintiff was qualified for her position; (3) that Plaintiff suffered the adverse employment action of constructive discharge; and (4) that the circumstances raise an inference that Plaintiff was retaliated against for making her complaints of sex discrimination.

## VIII.
## RESPONDEAT SUPERIOR

56. Employees involved in the discrimination described herein were at all times employees, agents, or representatives of the Defendant and were at all times acting in the course and scope of that employment. Accordingly, Defendant is liable for such conduct under the doctrine of Respondeat Superior.

## IX.
## DAMAGES

57. Plaintiff alleges that as a direct and proximate result of the conduct and/or omissions on the part of the Defendant, she is entitled to recover at least the following legal damages:

   a. Lost wages, past and future;

   b. Compensatory Damages, including Mental Anguish, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life suffered in the past, and which, in all reasonable probability, which will be suffered in the future;

   c. Pecuniary losses; and punitive damages

   d. Reasonable attorney fees, expert fees and costs.

   e. Based upon the above enumerated damages, the Plaintiff pleads for actual damages for the above damage elements in an amount the jury deems reasonable.

## X.
## ADMINISTRATIVE FILINGS

58. Plaintiff filed her original verified complaint with the Equal Employment Opportunity Commission alleging that the Defendant had committed and unlawful employment action against Plaintiff.

59. Thereafter, Plaintiff received a " Notice of Suit from the EEOC her charge, giving Plaintiff notice of her right to sue Defendant within 90 days of its receipt, attached hereto as **Exhibit "A"**. Plaintiff has timely filed this Plaintiff's Original Complaint.

## XI.
## ATTORNEY FEES

60. Defendant's conduct as described in this petition and the resulting damage and loss to Plaintiff has necessitated Plaintiff's retaining counsel.   Therefore, Plaintiff seeks all reasonable and necessary attorney fees in this case which would include at least the following:

   a. Preparation and trial of the claim, in an amount the jury deems reasonable;

   b. Post-trial, pre-appeal legal services, in an amount the jury deems reasonable;

   c. An appeal to the Court of Appeals, in an amount the jury deems reasonable;

   d. Making or responding to an Application for Writ of Error to the Supreme Court, and attorneys' fees if application for Writ of Error is granted, in an amount the jury deems reasonable; and

   e. Post-judgment discovery and collection in the event execution on the judgment is necessary, in an amount the jury deems reasonable.

## XI.
## JURY DEMAND

61. Plaintiff further demands a trial by jury.   A jury fee has been tendered.

## XII.
## PRAYER FOR RELIEF

WHEREFORE, Christin Royko requests that Newton Associates 1, Ltd. d/b/a Pizza Hut, be cited to appear and answer, and that on final trial, Royko have judgment against Defendant as follows:

1. judgment against Defendant for Royko's actual damages, including lost wages and benefits (both front and back pay);

2. judgment against Defendant for compensatory damages in the maximum amount allowed by law and for punitive damages;

3. pre-judgment and post-judgment interest at the maximum allowed by law;

4. costs of suit, including attorneys' fees; and

5. Such other and further relief, both at law and in equity, to which Royko may be justly entitled.

        **Respectfully Submitted,**

        **PONCIO LAW OFFICES**
        **A Professional Corporation**
        **5410 Fredericksburg Road, Suite 109**
        **San Antonio, Texas 78229-3550**
        **Telephone: (210) 212-7979**
        **Facsimile: (210) 212-5880**


        **BY:** */s/ Alan Braun*

            **ADAM PONCIO**
            STATE BAR NO. 16109800
            **ALAN BRAUN**
            STATE BAR NO. 24054488

            **ATTORNEYS FOR PLAINTIFF**